# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRENDALIZ CANDELARIA ROSARIO, | ) | 3:20-CV-00551 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration,[1] | ) | |
| *Defendant.* | ) | September 29, 2021 |

## MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER OR TO REMAND TO THE COMMISSIONER (ECF NO. 16) AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (ECF NO. 18)

Kari A. Dooley, United States District Judge:

Brendaliz Candelaria Rosario ("Plaintiff") brings this administrative appeal pursuant to 42 U.S.C. § 405(g). She appeals the decision of Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration (the "Commissioner"), denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). Plaintiff moves to reverse the Commissioner's decision or, in the alternative, to remand this matter for further proceedings. The Commissioner moves for an order affirming her decision. For the reasons set forth below, the Court DENIES the Plaintiff's motion to reverse the decision of the Commissioner or, in the alternative, to remand to the Commissioner and GRANTS the Commissioner's motion to affirm the decision.

---

[1] Plaintiff commenced this action against Andrew M. Saul as the Commissioner of Social Security on April 24, 2020. (ECF No. 1.) Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to FED. R. CIV. P. 25(d), Commissioner Kijakazi is automatically substituted for Andrew M. Saul as the named defendant. The Clerk of the Court is requested to amend the caption in this case accordingly.

**Standard of Review**

A person is "disabled" under the Act if that person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months[.]" 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D). In addition, a claimant must establish that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 1382c(a)(3)(B).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disabled. *See* 20 C.F.R. § 416.920. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months"; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of her

RFC and her education, age, and work experience. *Id.* §§ 416.920(a)(4)(i)-(v); 416.909. The claimant bears the burden of proof with respect to Step One through Step Four, while the Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

Sentence four of Section 405(g) of the Act provides that a "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also id.* § 1383(c)(3). It is well-settled that a district court will reverse the decision of the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The Court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*,

683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*) (quotation marks and citation omitted). Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

**Procedural History**

On February 12, 2015, Plaintiff filed an application for SSI pursuant to Title XVI of the Act, alleging an onset date of February 12, 2015. The claim was denied initially on June 17, 2015, and upon reconsideration on October 15, 2015. (Tr. 588; 600.)  Thereafter, a hearing was held before an Administrative Law Judge ("ALJ") on October 19, 2016. (Tr. 520.) On May 31, 2017, the ALJ issued a written decision denying Plaintiff's application. (Tr. 621.) On August 28, 2018, the Appeals Council remanded the case back to the ALJ. (Tr. 627.) Upon remand, another hearing was held before the ALJ on January 4, 2019 and the ALJ issued another decision denying Plaintiff's application on January 24, 2019.  (Tr. 487; 549.)

In the January 2019 decision, which is the subject of this appeal, the ALJ followed the sequential steps for assessing disability claims. At Step One, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 12, 2015. (Tr. 490.) At Step Two, the ALJ determined that Plaintiff had medically determinable severe impairments consisting of fibromyalgia; left shoulder tendinitis; depression; anxiety; a post-traumatic stress disorder; and an unspecified intellectual disorder. (*Id.*) The ALJ also determined that the Plaintiff had non-severe impairments to include uterine fibroids, anemia, obstructive sleep apnea, and asthma. (*Id.*) At Step Three, the ALJ determined Plaintiff's severe impairments do not meet or medically equal the listings in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 491–94.)  At Step Four, the ALJ determined that the Plaintiff had the following RFC:

> [Plaintiff has the RFC] to perform light work as defined in 20 CFR 416.967(b) except that the claimant could frequently climb ramps and stairs. The claimant could occasionally climb ropes, ladders, and scaffolds. The claimant could frequently

stoop, kneel, crouch, and crawl. The claimant could have no concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases. The claimant is limited to occasional overhead reaching with the bilateral upper extremities. The claimant is able to understand, remember, and carry out simple tasks in a setting with no more than occasional contact with the public or co-workers, provided collaboration on tasks is not required.

(Tr. 495.) The ALJ further found that Plaintiff has no past relevant work. (Tr. 504.) At Step Five, the ALJ concluded that there are a significant number of jobs in the national economy that Plaintiff could perform given the limitations identified in the RFC. (Tr. 506.)  Accordingly, the ALJ found that Plaintiff was not disabled at any time between the alleged onset date through the date of the decision within the meaning of the Act.

On March 5, 2020, the Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's January 24, 2019 decision final. (Tr. 1.)  This appeal followed.

**Discussion**

Plaintiff principally argues that the ALJ erred in his consideration of three medical opinions regarding the level of impairment Plaintiff's mental health or cognitive limitations would occasion in the workplace. She argues that he erred in the weight he assigned to these opinions, that he violated the treating physician rule, and, that having done so, he substituted his own opinion for that of the medical experts. For the reasons discussed below, the Court disagrees and determines that the ALJ's decision is supported by substantial evidence.

### *The Medical Opinion Evidence*

"It is well established that 'an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.'" *Kurlan v. Berryhill*, No. 3:18-CV-00062 (MPS), 2019 WL 978817, at *1 (D. Conn. Feb. 28, 2019) (quoting *Staggers v. Colvin*, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015)). Here, Plaintiff submits that the ALJ

substituted his opinion for those of Dr. David Melman, Plaintiff's psychiatrist, Dr. Angelica Valentin-Colon, a consulting examiner, and Ms. Wanda Serrano-Miller, Plaintiff's therapist, when formulating Plaintiff's RFC. Plaintiff asserts that the opinion evidence is "entirely contrary" to the ALJ's findings. (Pl.'s Mem. at 15, ECF No. 16-1.)

Plaintiff further argues that the ALJ violated the treating physician rule by failing to assign controlling weight to the medical sources' opinions or, in the alternative, by failing to provide good reasons for assigning them lesser weight. The applicable version of the regulation from which the so-called "treating physician rule" derives required the ALJ to confer "controlling weight" on medical opinions from Plaintiff's "treating sources," so long as those opinions "on the issue(s) of the nature and severity of [Plaintiff's] impairment(s) [are] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2);[2] *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) ("[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," except where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."). "Treating source" is defined as an "acceptable medical source" who has provided the Plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the Plaintiff.]" 20 C.F.R. § 416.927(a)(2).

"If a treating source's opinion is <u>not</u> given controlling weight, 'SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive.'" *Consiglio v. Berryhill*, No. 3:17-CV-00346 (SALM), 2018 WL 1046315, at *4 (D. Conn. Feb. 26,

---

[2] On January 18, 2017, the Social Security Administration promulgated final rules, effective March 27, 2017, that significantly change the way the Commissioner considers medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulation, 20 C.F.R. § 416.920c, applies only to claims filed on or after March 27, 2017 and is therefore not applicable to Plaintiff's claim here.

2018) (quoting *Greek*, 802 F.3d at 375). "'To override the opinion of the treating physician, . . . the ALJ must explicitly consider, <u>inter alia</u>: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist.'" *Id.* (quoting *Greek*, 802 F.3d at 375). "However, a 'slavish recitation of each and every factor' is unnecessary 'where the ALJ's reasoning and adherence to the regulation are clear.'" *Id.* (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. Feb. 21, 2013) (summary order)).

Having reviewed all of the opinions that the ALJ considered alongside the medical record as a whole, the Court can identify no error in the ALJ's decision to confer only partial weight on the opinions of Drs. Melman and Valentin-Colon and little weight to that of Ms. Serrano-Miller. And although Plaintiff is correct that there is "a large body of case law holding that 'an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error,'" *Staggers*, 2015 WL 4751123, at *2 (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)), that is not what happened here. As discussed below, the ALJ considered the opinions of Dr. Melman, Dr. Valentin-Colon, and Ms. Serrano-Miller alongside the medical record as a whole and assigned them varying degrees of weight. His well-supported decision to give less than controlling weight to these opinions is therefore not the equivalent of rendering an RFC without the benefit of any medical opinion as the Plaintiff contends.

### Dr. David Melman

Plaintiff submitted a medical source statement from Dr. Melman, her psychiatrist, dated November 26, 2018. (Tr. 2411–15.) Therein, Dr. Melman indicated that he began treating the Plaintiff on August 30, 2016, approximately 18 months after the alleged onset date. (Tr. 2411.) He opined that, with respect to Plaintiff's "ability to understand, remember, or apply information,"

Plaintiff had only mild[3] and moderate[4] limitations. (Tr. 2411.) As to Plaintiff's "ability to interact appropriately with others (for example supervisors, co-workers, and the public)," Dr. Melman mostly found "none"[5] to moderate limitations, though "marked"[6] limitations in the following areas: "[h]andling conflicts with others" and "[r]esponding to requests, suggestions, criticism, correction, and challenges and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." (Tr. 2412.) Regarding Plaintiff's "ability to maintain concentration, persistence or pace," Dr. Melman found only no or moderate limitations, while finding a marked limitation in the area of "[s]ustaining an ordinary routine and regular attendance at work and working a full day without needing more than the allotted number or length of rest periods during the day." (Tr. 2413.) And, regarding Plaintiff's "ability to adapt or manage [her]self . . . (for example ability to regulate emotion, control behavior, and maintain well-being in a work setting)," Dr. Melman found only no to moderate limitations. (Tr. 2413–14.)

Dr. Melman further found that: (1) Plaintiff "rel[ies], on an ongoing basis, upon medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) to diminish the symptoms and signs of the mental disorder"; (2) "[d]espite treatment/diminished symptoms and signs . . . the claimant [has] only marginal adjustment (adaptation to requirements of daily life is fragile, that is, they have minimal capacity to adapt to changes in the environment or to demands that are not already part of their daily life)"; and (3) "changes or increased demands lead to exacerbation of symptoms and to deterioration in functioning (for example unable to

---

[3] According to the Medical Source Statement, "mild" indicates that "[t]here is a slight limitation in this area, but the individual can generally function well." (Tr. 2411.)

[4] According to the Medical Source Statement, "moderate" indicates that "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (Tr. 2411.)

[5] According to the Medical Source Statement, "none" indicates that limitations are "[a]bsent or minimal, and"[i]f limitations are present they are transient and/or expected." (Tr. 2411.)

[6] According to the Medical Source Statement, "marked" indicates that "[t]here is serious limitation in this area. There is a substantial loss in the ability to effectively function." (Tr. 2411.)

function outside of home or need a more restrictive setting, or cannot function without substantial psychosocial supports)[.]" (Tr. 2414.) In contrast to these findings, Dr. Melman indicated that Plaintiff could manage benefits in her own best interest, and he characterized her mental disorder as persistent but **not serious.** (Tr. 2414.) Lastly, Dr. Melman did not opine as to how many days per month Plaintiff would "be absent or unable to report to work secondary to [her] psychiatric symptoms" because he concluded that Plaintiff "would need to attempt employment first"; nor did he assess whether Plaintiff's mental impairments would cause her to be off task because she was not working. (Tr. 2415.)

The ALJ assigned Dr. Melman's opinion partial weight insofar as it was "only partially consistent with the evidence of record as a whole[.]" (Tr. 502.) The ALJ noted that despite experiencing some symptoms that were consistent with anxiety, depression, and a mental impairment, Plaintiff "often appeared alert, oriented, neatly groomed, and cooperative with a euthymic mood, a neutral affect, and a coherent thought process[.]" (Tr. 502.) The ALJ also found noteworthy that Plaintiff "frequently denied having any memory problems or difficulty thinking at all"; "could complete household chores and provide care for her granddaughter at times"; and "completed English classes, managed her medications, and made crafts, crocheted, and watched television[.]" (Tr. 502.) The ALJ contrasted this evidence with Dr. Melman's findings and observed that Dr. Melman did not support his opinion "with objective medical evidence . . . instead, he simply offered conclusory statements largely grounded in the [Plaintiff's] subjective reports of limitation." (Tr. 502.) In this vein, the Court further observes that the medical source statement is blank where the provider is asked to explain the basis for the opinions offered. (Tr. 2412–2414.) Lastly, the ALJ found Dr. Melman's opinion to be "internally inconsistent" to the extent that Dr. Melman "opined that the [Plaintiff] needed a highly structured living environment to manage her symptoms but also opined that she could manage her own benefits and that she had no more than

mild-to-moderate limitation in adaptive functioning." (Tr. 502.) Indeed, Dr. Melman identified Plaintiff's mental disorder as "not serious." (Tr. 2414.) Despite these inconsistencies, the ALJ assigned partial weight to Dr. Melman's opinion because he was a treating source and his opinions were partially supported by Dr. Melman's and others' treatment records, and because he is a mental health specialist.  (Tr. 502.)

The ALJ did not replace Dr. Melman's opinion with his own in formulating the Plaintiff's RFC. As the Commissioner argues, the ALJ incorporated non-exertional limitations into Plaintiff's RFC, to include limiting Plaintiff to "carry[ing] out simple tasks in a setting with no more than occasional contact with the public or co-workers, provided collaboration on tasks is not required." (Tr. 495.) Thus, consistent with Dr. Melman's findings of some marked limitations in Plaintiff's ability to interact with others, the ALJ limited Plaintiff to occasional contact with others and no collaboration on tasks. Furthermore, although Dr. Melman indicated that Plaintiff had a marked limitation "[s]ustaining an ordinary routine and regular attendance at work and working a full day without needing more than the allotted number or length of rest periods during the day" (Tr. 2413), Dr. Melman also stated that he could not opine as to whether Plaintiff would miss work or whether Plaintiff's condition would cause her "to be off task from work related activities" because she was not working. (Tr. 2415.) Thus, the ALJ could not have incorporated attendance limitations or off-task behavior into Plaintiff's RFC based on Dr. Melman's opinion. And, in any event, Plaintiff's RFC need not "perfectly correspond" with Dr. Melman's opinion. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. Jan. 25, 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Nor did the ALJ's assignment of partial weight to Dr. Melman's opinion violate the treating physician rule. Indeed, the ALJ appropriately considered Dr. Melman's opinion in the context of the entire record. The ALJ acknowledged that Dr. Melman was a treating source and a mental health specialist but did not assign his opinion controlling weight principally because it was internally inconsistent and inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2) (noting that the ALJ will confer controlling weight to the medical opinion of Plaintiff's treating source so long as, *inter alia*, it is "not inconsistent with the other substantial evidence in [the] case record").

As to internal inconsistencies, as discussed above, although Dr. Melman indicated that Plaintiff has marked limitations in various areas, which is defined in part as a "serious limitation" (Tr. 2411), Dr. Melman specifically noted that Plaintiff's mental disorder was not serious. (Tr. 2414.) Additionally, although Dr. Melman found that Plaintiff had only marginal adjustment, or "minimal capacity to adapt to changes in the environment or to demands that are not already part of [her] daily life," and that "changes or increased demands lead to exacerbation of symptoms and to deterioration in functioning," which suggests the need for a "more restrictive setting" or "substantial psychological supports" (Tr. 2414), Dr. Melman only found mild to moderate limitations (with, as noted, a moderate limitation providing that "the individual is still able to function satisfactorily", Tr. 2411) with respect to Plaintiff's ability to adapt or manage herself (Tr. 2413), and he found that Plaintiff could manage benefits in her best interest. (Tr. 2414.) Importantly, Dr. Melman indicated that Plaintiff has a marked limitation in "[s]ustaining an ordinary routine and regular attendance at work and working a full day without needing more than the allotted number or length of rest periods during the day" (Tr. 2413); yet he also stated he could not assess whether Plaintiff's condition would cause her to miss work or "to be off task from work related activities" because she was not working. (R. 2415.) These inconsistencies alone support the

ALJ's assignment of less than controlling weight to Dr. Melman's opinion. *See Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. Oct. 25, 2012) (summary order) ("A physician's opinions are given less weight when his opinions are internally inconsistent.").

In addition, Dr. Melman's opinion is at odds with the record as a whole, to include his own treatment notes. For example, notwithstanding the purported limitations identified in the November 26, 2018 source statement, Plaintiff consistently presented as "[a]lert and oriented." (Tr. 1756; 2119; 2507; 2553.) Dr. Melman also frequently noted that Plaintiff was "cooperative" and had a coherent thought process. (Tr.1756; 2119; 2507; 2553.) LCSW Serrano-Miller likewise repeatedly indicated that Plaintiff presented as oriented, especially to time, place, and person. (*See* Tr. 1791; 1787; 1786; 1780; 1772; 1771; 1191; 1760; 1761; 1754; 2124; 2121; 2116; 2515; 2509; 2561; 2558; 2555; 2550; 2547.) And Plaintiff herself often denied experiencing any difficulty with her memory or thinking. (*See* Tr. 1165, 1170, 1172, 1174, 1176, 1178, 1180.) Plaintiff's activities of daily living, as reported on February 25, 2015 and October 6, 2015, also reflect that Plaintiff is able to function beyond the limitations identified in portions of Dr. Melman's opinion.[7] (Tr. 847–56; 877–84.) For example, Plaintiff, cares for her granddaughter by helping her get ready for school and by providing her with food, shelter and clothing, and Plaintiff can prepare simple meals, drive a vehicle, use public transportation, shop, pay bills, count change, and take English classes, (Tr. 851–52, 854, 877, 879–81), which she apparently completed. (*See* Tr. 557.) In a June 2, 2015 psychological evaluation, Plaintiff described herself as "sociable and able to communicate well

---

[7] Plaintiff argues that the ALJ placed undue emphasis on Plaintiff's self-reported activities of daily living, which do not accurately reflect how Plaintiff would function in the course of an eight-hour workday. However the ALJ was entitled to consider the Plaintiff's activities of daily living when assessing how the record as a whole supports or contradicts a medical source statement. *See, e.g., Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. Dec. 18, 2020) (summary order) (concluding that "[t]he ALJ's decision not to afford Shah's opinion controlling weight as the treating physician is well-supported by the record, which contains notes showing [plaintiff's] improved mood and her ability to independently manage reported activities of daily life, including tasks such as cooking, cleaning, self-care, banking, shopping and driving without assistance.").

with others" and she "describe[d] her interactions as appropriate and effective." (Tr. 1138.) The Court further observes that Dr. Melman's records reveal that Plaintiff was consistently on time to her appointments. (Tr. 1756; 2119; 2507; 2553.)  Accordingly, there is substantial evidence in the record to support the ALJ's determination that Dr. Melman's opinion should be given only partial weight, and this determination did not therefore violate the treating physician rule.

### *Dr. Angelica Valentin-Colon*

The ALJ considered the January 2017 opinion of consultative examiner Dr. Angelica Valentin-Colon, who met with the Plaintiff to assess her mental impairment. During the consultative examination, Dr. Valentin-Colon administered the Escala de Inteligencia Wechsler Para Adultos- Tercera Edición (EIWA-III), which "is a Spanish language adaptation of the Wechsler Adult Intelligence Scale- Third Edition (WAIS-III)." (Tr. 1861.) According to this assessment, Plaintiff "obtained a Full Scale IQ score of 61 which is found to be in the Extremely Low range and above 0.5% of her peers[,]" and, as a result, Plaintiff might "experience significant difficulties in keeping up with her peers in a variety of situations that require thinking and reasoning abilities." (Tr. 1861.) Additionally, Plaintiff "presented significant difficulties to process verbal information, to interpret visual and nonverbal information and to solve abstract or ambiguous problems" and "to simultaneously store and manipulate orally presented information in short-term memory, remember[] complex or multi-step instructions, as well as difficulties to mentally process simple or routine information without making mistakes." (Tr. 1863.) Though, Dr. Valentin-Colon also found it "[n]oteworthy" that Plaintiff "can understand and follow simple instructions[,] [and] can sustain attention to perform simple repetitive tasks, but might need some accommodations to be able to perform them [i]n an effective manner" and that she would "benefit from obtaining assistance in managing her own funds." (Tr. 1863.)

13

Like Dr. Melman, Dr. Valentin-Colon also found Plaintiff to exhibit varying degrees of limitations. (Tr. 1864–66.) First, in her Medical Source Statement Dr. Valentin-Colon found mild to marked limitations in Plaintiff's "ability to understand, remember, and carry out instructions," including marked limitations in Plaintiff's ability to: "[u]nderstand and remember complex instructions"; "[c]arry out complex instructions"; and "make judgments on complex work-related decisions." (Tr. 1864.) And second, Dr. Valentin-Colon found marked limitations in Plaintiff's "ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting," to include Plaintiff's ability to: "[i]nteract appropriately with the public"; "[i]nteract appropriately with supervisor(s)"; "[i]nteract appropriately with co-workers"; and "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. 1865.) Lastly, Dr. Valentin-Colon indicated that Plaintiff cannot manage her benefits in her best interest and would "benefit from obtaining assistance." (Tr. 1866.)

The ALJ assigned Dr. Valentin-Colon's opinion partial weight. (Tr. 501.) As with Dr. Melman's opinion, the ALJ found Dr. Valentin-Colon's opinion only partially consistent with the record insofar as Plaintiff "often appeared alert, oriented, neatly groomed, and cooperative with a euthymic mood, a neutral affect, and a coherent thought process" despite exhibiting various symptoms of mental impairment. (Tr. 501.) In addition, he noted that the record indicated that Plaintiff "frequently denied having any memory problems or difficulty thinking at all, . . . could complete household chores and provide care for her granddaughter at times, and . . . completed English classes, managed her medications, and made crafts, crocheted, and watched television[.]" (Tr. 501.) The ALJ also noted that "Dr. Valentin-Colon only evaluated [Plaintiff once] and the cognitive testing results that she relied upon are inconsistent with the claimant's ability to care for her granddaughter, take English classes, prepare simple meals, use public transportation, take her medications independently, and to shop[.]" (Tr. 501.) In a footnote, the ALJ indicated his

understanding that the Spanish-language cognitive testing used by Dr. Valentin-Colon has "significant reliability problems[.]" (Tr. 501; *see* Tr. 497–98.) Lastly, the ALJ found that the value of Dr. Valentin-Colon's opinion regarding Plaintiff's social limitations was significantly reduced by her reliance on Plaintiff's subjective reports. (Tr. 501.) Despite the ALJ's identified concerns with the reliability of Dr. Valentin-Colon's opinion, he gave it partial weight because Dr. Valentin-Colon is a mental health specialist. (Tr. 501.)

In so doing, the ALJ incorporated some of Dr. Valentin-Colon's conclusions into Plaintiff's RFC. Indeed, consistent with Dr. Valentin-Colon's findings that Plaintiff "can understand and follow simple instructions" and "can sustain attention to perform simple[,] repetitive tasks" with "some accommodations," the ALJ limited Plaintiff to simple tasks. (Tr. 495; 1863.) Further, consistent with Dr. Valentin-Colon's finding that Plaintiff has marked limitations with respect to her ability to interact appropriately with others, the ALJ limited Plaintiff to "no more than occasional contact with the public or co-workers" and also limited Plaintiff to tasks for which collaboration is not required. (Tr. 495; 1865.) And, with respect to Plaintiff's off-task behavior, the ALJ did not fail to incorporate Dr. Valentin-Colon's finding because Dr. Valentin-Colon did not make a finding regarding Plaintiff's off-task behavior.

The ALJ did not therefore substitute his own opinion for that of Dr. Valentin-Colon. And to the extent Plaintiff makes the argument, the ALJ's assignment of partial weight to Dr. Valentin-Colon's opinion did not violate the treating physician rule because the treating physician rule does not apply to Dr. Valentin-Colon's opinion as she was not a "treating source." 20 C.F.R. § 416.927(a)(2) ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability"); (Tr. 1858 (noting that Plaintiff "was referred for a mental status examination by the State of Connecticut Bureau of

15

Rehabilitation Services/Disability Determination Services to assist with disability determination.").) Nevertheless, the ALJ is required to consider the same factors in assigning weight to a non-treating source's opinion as he is in the event that the treating physician's opinion is not given controlling weight. 20 C.F.R. § 416.927(c). As discussed above, and upon review of the entire record, the Court concludes that the ALJ did not err in assigning partial weight to Dr. Valentin-Colon's opinion and his decision in this regard is supported by substantial evidence. The ALJ acknowledged that Dr. Valentin-Colon was a mental health specialist, but also noted that she only evaluated Plaintiff once. (Tr. 501.) Moreover, the ALJ found that Dr. Valentin-Colon's opinions were only partially consistent with the record for mostly the same reasons discussed above regarding the inconsistencies between Dr. Melman's opinion and the record evidence. One of Dr. Valentin-Colon's more significant findings was Plaintiff's IQ score of 61. (Tr. 1861.) However, as the ALJ reasoned, relying on cognitive testing to formulate an opinion as to Plaintiff's limitations disregards Plaintiff's demonstrated abilities as set forth in the record. (Tr. 501.) For example, Plaintiff took English classes three times a week, cared for her granddaughter, prepared meals for herself, and used public transportation. (Tr. 847; 852; 877; 879; 880.) To further discount the finding, the ALJ also cited to "National Question & Answer 12-001 Rev1," which apparently states that "'[m]ost of the available intelligence tests in the Spanish language have serious limitations. . . . [to] include not having normative data based on Spanish-speaking individuals who reside in the U.S[.]" (Tr. 498 n.4 (brackets omitted).) Plaintiff asserts that this citation was improper insofar as the ALJ utilized evidence outside the record to undermine Dr. Valentin-Colon's finding. While the Court has been unable to identify this source, to the extent the ALJ erred in citing it, such error was harmless because the ALJ's weight assignment is otherwise supported by substantial evidence, to include Plaintiff's demonstrated abilities, which undermine the IQ testing results.

### Ms. Wanda Serrano-Miller

The ALJ considered the August 2016 opinion of treating source Wanda Serrano-Miller, LCSW, Plaintiff's therapist. (Tr. 1194–96.) Regarding Plaintiff's "ability to understand, remember, and carry out instructions," Ms. Serrano-Miller found Plaintiff to have moderate[8] and marked[9] limitations, to include marked limitations in her ability to "[c]arry out short, simple instructions"; "[u]nderstand and remember detailed instructions"; and "[c]arry out detailed instructions." (Tr. 1194.) And regarding Plaintiff's "ability to respond appropriately to supervision, co-workers, and work pressures in a work setting," Ms. Serrano-Miller deemed Plaintiff to have moderate and marked limitations, to include marked limitations in her ability to "[i]nteract appropriately with the public" and "[i]nteract appropriately with supervisor[s]." (Tr. 1195.) Ms. Serrano-Miller also found that Plaintiff has moderate limitations in her "activities of daily living" and "in maintaining social functioning," and frequent[10] "[d]eficiencies of concentration[,] persistence[,] or pace resulting in failure to complete tasks in a timely manner." (Tr. 1195.) Ms. Serrano-Miller additionally concluded that Plaintiff has at least repeated ("3 or more times") "[e]pisodes of deterioration or decompensation in work or work-like settings which cause [Plaintiff] to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." (Tr. 1195.) Lastly, and remarkably, notwithstanding all of these purported deficiencies in her ability to function, Ms. Serrano-Miller indicated that Plaintiff could manage her own benefits. (Tr. 1196.)

---

[8] In this Medical Source Statement, "moderate" indicates that "[t]here is moderate limitation in this area but the individual is still able to function satisfactorily." (Tr. 1194.)

[9] In this Medical Source Statement, "marked" indicates that "[t]here is serious limitation in this area. The ability to function is severely limited but not precluded." (Tr. 1194.)

[10] In this Medical Source Statement, "marked" and "frequent" have the same definition. (Tr. 1194.)

Upon review of the record, it is no surprise to this Court that the ALJ assigned little weight to Ms. Serrano-Miller's opinion (Tr. 502–03), finding it inconsistent with the record. The ALJ again noted that notwithstanding various symptoms attributable to her mental impairments, Plaintiff "often appeared alert, oriented, neatly groomed, and cooperative with a euthymic mood, a neutral affect, and a coherent thought process," and Plaintiff "frequently denied having any memory problems or difficulty thinking at all, . . . could complete household chores and provide care for her granddaughter at times, and . . . completed English classes, managed her medications, and made crafts, crocheted, and watched television despite her complaints." (Tr. 502.) The ALJ also observed that Ms. Serrano-Miller appeared, with respect to some of her opinions, to simply defer to Plaintiff's "subjective complaints." (Tr. 502.) Indeed, the ALJ noted that "Ms. Serrano-Miller failed to support her opinions with objective medical evidence or mental status examination findings, and she also considered the claimant's physical conditions . . . even though she did not provide treatment [therefor]," which "significantly reduces the value of [Ms. Serrano-Miller's] opinions." (Tr. 502–03.) Therefore, the ALJ assigned little weight to Ms. Serrano-Miller's opinion.

Again, the ALJ did not substitute his opinion for Ms. Serrano-Miller's opinion. Indeed, although giving it little weight, the ALJ did not completely reject Ms. Serrano-Miller's opinion. Consistent with Ms. Serrano-Miller's finding that Plaintiff has a marked limitation in carrying out detailed instructions, the ALJ limited Plaintiff to simple tasks. (Tr. 495; 1194.) Moreover, consistent with Ms. Serrano-Miller's finding of moderate to marked limitations in Plaintiff's ability to interact with others in the workplace, the ALJ limited Plaintiff to "no more than occasional contact with the public or co-workers." (Tr. 495; 1195.) The Court recognizes that Ms. Serrano-Miller also found that Plaintiff has a marked limitation in carrying out "short, simple instructions" and that Plaintiff would frequently experience "[d]eficiencies of concentration[,] persistence[,] or pace resulting in failure to complete tasks in a timely manner," and that she would repeatedly

experience "[e]pisodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." (Tr. 1194–95.) However, as discussed below, Ms. Serrano-Miller's findings are, in many respects, contradicted by the record evidence, to include her own treatment notes.[11]

Indeed, Ms. Serrano-Miller's own treatment notes frequently indicated that Plaintiff was oriented to time, place, and person and that she only had minimal impairment in both her judgment and insight. (*See* Tr. 1791; 1787; 1786; 1780; 1772; 1771; 1191; 1760; 1754; 2124; 2121; 2116; 2515; 2509; 2561; 2558; 2555; 2550; 2547.) Notably, despite these numerous treatment notes indicating Plaintiff's minimally impaired judgment, Ms. Serrano-Miller opined that Plaintiff had a *moderate* limitation in her "ability to make judgements on [s]imple work-related decisions." (Tr. 1194.) To be consistent with her treatment notes, Ms. Serrano-Miller could have selected "none" with respect to this category, which would have indicated "[a]bsent or *minimal* limitations." (Tr. 1194 (emphasis added).) Further, as the ALJ noted, it does not appear that Ms. Serrano-Miller based her opinions on any objective medical evidence. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Indeed, the Court's independent review of Ms. Serrano-Miller's treatment notes failed to reveal any substantial

---

[11] Nor did the ALJ's assignment of little weight to Ms. Serrano-Miller's opinion violate the treating physician rule, as the treating physician rule does not apply to Ms. Serrano-Miller's opinion because she is a licensed clinical social worker. *Grega v. Saul*, 816 F. App'x 580, 583 (2d Cir. June 8, 2020) (summary order) (noting that a licensed clinical social worker does not "qualif[y] as an 'acceptable medical source' to whom the treating physician rule would apply") (internal citations omitted). Nevertheless, such medical sources' opinions are evaluated using the same factors. 20 C.F.R. § 416.927(f)(1).

support for the limitations identified in the medical source statement. For these reasons, the ALJ did not err in assigning little weight to Ms. Serrano-Miller's opinion.[12]

### Failure to Develop the Record

Finally, Plaintiff asserts that the ALJ should have further developed the record. The Court disagrees. Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Social Security Act, "the ALJ generally has an affirmative obligation to develop the administrative record" due to the non-adversarial nature of a hearing on disability benefits. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quotation marks and citation omitted). There is no obligation, however, to re-contact a treating physician where the evidence of record is "adequate to permit the ALJ to make a disability determination." *Carvey v. Astrue*, 380 F. App'x. 50, 53 (2d Cir. June 7, 2010) (summary order); *see Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996). To the extent that the record is insufficient or inconsistent, the Commissioner "will determine the best way to resolve the inconsistency or insufficiency." 20 C.F.R. § 416.920b(b)(2). The Commissioner "may recontact [the claimant's] medical source," or [she] can take other steps, such as "ask[ing] [the claimant] to undergo a consultative examination" or ask "others for more information." *Id*. § 416.920b(b)(2)(i)–(iv).

As discussed above, there was substantial evidence to support the ALJ's determination regarding the weight given the medical sources and the ALJ was not without a medical opinion with which to determine the Plaintiff's RFC. Accordingly, there was no requirement that the ALJ

---

[12] Although the ALJ did not specifically mention Ms. Serrano-Miller's treatment relationship with Plaintiff, as noted previously "a 'slavish recitation of each and every factor' is unnecessary 'where the ALJ's reasoning and adherence to the regulation are clear.'" *Consiglio*, 2018 WL 1046315, at *4 (quoting *Atwater*, 512 F. App'x at 70); *see also* 20 C.F.R. § 416.927(f)(2) (regarding "[o]pinions from medical sources who are not acceptable medical sources and from nonmedical sources . . . [t]he adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case").

further develop the medical evidence on these issues. Nor was the ALJ required to develop the record with respect to the reliability of Spanish language intelligence tests. As discussed above, the ALJ's apparent reliance on his perception that Spanish-language testing is of questionable reliability was at most harmless error.

**Conclusion**

For the foregoing reasons, Plaintiff's motion to reverse the decision of the Commissioner or to remand to the Commissioner is DENIED. The Commissioner's motion to affirm the decision is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of September 2021.

 */s/ Kari A. Dooley*               
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE